NINA MARINO, ESQ. (State Bar No. 142815)
JENNIFER LIESER, ESQ. (State Bar No. 313707)
MORIAH RADIN, ESQ. (State Bar No. 260245)
COLLIN CATE, ESQ. (State Bar No. 365876)
KAPLAN MARINO, PC
1546 N. Fairfax Ave.
Los Angeles, CA 90046
Tel: (310) 557-0007
Fax: (310) 861-1776
E-mail: marino@kaplanmarino.com
        lieser@kaplanmarino.com
        radin@kaplanmarino.com
        cate@kaplanmarino.com

Attorneys for Defendant
SAMIR OUSMAN ALSHEIKH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 24-CR-00483-HDV |
| Plaintiff, | ) **NOTICE OF RENEWED MOTION** |
| | ) **AND RENEWED MOTION FOR** |
| v. | ) **ORDER DECLARING MISTRIAL;** |
| | ) **OR, IN THE ALTERNATIVE, TO** |
| | ) **STRIKE IMPROPER CROSS** |
| | ) **EXAMINATION AND** |
| SAMIR OUSMAN ALSHEIKH | ) **TESTIMONY** |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

PLEASE TAKE NOTICE that on March 16, 2026, defendant Samir Ousman Alsheikh, by and through undersigned counsel, will and hereby renews his motion for an Order declaring a mistrial, or, in the alternative, to strike improper cross examination and testimony of defense expert witness, Hanadi, and issue a curative instruction. This Motion is based on Alsheikh's rights and privileges under the Fifth and Sixth Amendments to the United States Constitution, the Federal Rules of Evidence, prevailing case law, the Memorandum of Points and Authorities set forth below, the trial testimony, the pleadings and papers on file, and any oral argument permitted by the Court.

Dated: March 15, 2026                    Respectfully submitted,


By: /s/*Jennifer Lieser*
       NINA MARINO
       JENNIFER LIESER
       MORIAH RADIN
       COLLIN CATE
       Attorneys for Defendant
       Samir Ousman Alsheikh

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS EXAMINATION AND TESTIMONY

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Defendant Samir Ousman Alsheikh, by and through undersigned counsel, respectfully moves this Court for an order declaring a mistrial or, in the alternative, striking the impermissible cross-examination conducted by the government during its questioning of defense expert witness Hanadi, and issuing a curative instruction.

During cross-examination, the government read (incorrectly) quotations from two foreign judicial opinions – an asylum decision from France and an asylum decision from the Netherlands, stating, without context, that torture occurred at Adra Prison. This tactic was improper for multiple independent reasons: (1) the quotations were misrepresented to the jury as "conclusions" rather than contextual statements that did not include specific factual findings; (2) reading of the judicial opinions during cross examination constituted inadmissible hearsay; (3) their introduction created substantial unfair prejudice under Federal Rule of Evidence 403 by inviting the jury to defer to foreign judicial factfinding rather than make independent credibility determinations; (4) the quoting from the contents of the judicial opinions violated Alsheikh's Sixth Amendment rights to confrontation.

The core issue the jury must decide in this case is whether torture occurred at Adra Prison under Alsheikh's direction during 2005 to 2008. By reading judicial opinions from foreign asylum cases that were represented to purportedly address this very issue and stating that an opinion "concluded" torture took place at Adra, the government impermissibly substituted judicial factfinding for the jury's independent determination, the precise harm the Ninth Circuit condemned in *United States v. Sine*, 493 F.3d 1021 (9th Cir. 2007).

### II.    STATEMENT OF RELEVANT FACTS

On March 13, 2026, the defense called as an expert witness Hanadi, a Syrian human rights activist who testified to having monitored the arrests, detentions, court

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS
EXAMINATION AND TESTIMONY

proceedings, and incarceration of political activists and documenting human rights violations committed by the Bashar al-Assad regime from 2002 to 2012.

During direct examination, Hanadi testified extensively about her real-time documentation of detention conditions at Adra Prison during the 2005 to 2008 period. Based on her interviews with political prisoners detained at Adra during that period, their families, and their attorneys, Hanadi testified that conditions at Adra were substantially better than at military prisons, that political prisoners had access to visitation, food, healthcare, and legal representation, and that she received no reports of torture or severe mistreatment of political prisoners at Adra during that time.

During cross-examination, the government questioned Hanadi about two foreign judicial opinions that addressed asylum appeals by individuals who had worked for the regime and were cited by the government's expert, Dr. Reinoud Leenders, in his report that was not provided to the jury. (Ex. A, 3.13.26 Draft Transcript of Hanadi Cross Examination and Argument, at 21:7-23:23.) When asked if she was familiar with either, she said she was not. (Ex. A at 21: 11-12, 22: 12-14.)[1] Undeterred, the government continued, quoting (although, conveniently, not verbatim) the contents of these foreign judicial opinions, cherry picking lines taken out of context from the opinion as a whole.

The defense's objections to this line of question during the cross examination were overruled with an instruction from the Court: "I will instruct the jury though that questions by attorneys are not evidence." (Ex. A at 22:5-6.) This was insufficient to cure inadmissible hearsay, improper Rule 403 admission, or Confrontation Clause issues. The defense renewed its objection and moved for a mistrial after the examination of Hanadi concluded. (Ex. A at 26: 13-19.) The government argued that

---

[1] The government also cited various international articles. While not subject to this present motion, the defense preserves its right to challenge this line of questioning.

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS EXAMINATION AND TESTIMONY

1    it was asking about the sources of information Hanadi reviewed to determine

2    whether those source were sufficient for her opinion testimony. (Ex. A, 26: 21-27:2

3    (paraphrased). The government also argued that the court can take judicial notice of

4    court cases because they are reliable.[2] The Court has not taken judicial notice of

5    these opinions. This Court denied the defense's request.

6    <u>The actual content of the foreign judicial opinions</u>

7        A review of the actual judicial opinions quoted by the government reveals that

8    the government's presentation was misleading or, at best, incomplete. Neither

9    opinion contained a "holding" or specific factual finding that torture occurred at

10   Adra Prison during 2005 to 2008.

11       <u>The French Decision (November 10, 2021):</u> The French decision concerned

12   an asylum application by a Syrian doctor who worked at Adra Prison from 1999 to

13   2006 and then at Harasta police hospital from 2010 to 2012. The statement quoted

14   by the government – that "the Syrian regime practiced torture against political

15   opponents, in particular those held in Adra Central Prison" – was not a factual

16   finding or a holding by the French court. In fact, quite the opposite, it stated: "*it is*

17   *not under discussion, nor is it necessary to include in the examination of the appeal*,

18   that during the periods at issue here, between 1999 and 2006 and then between 2010

19   and 2012, the Syrian regime practiced torture against political opponents, in

20   particular those held in Adra Central Prison or at the Harasta police hospital." (Ex.

21   B, French Asylum Application Appeal dated Nov. 10, 2021 (emphasis added).)

22       First, and most significantly, the government misrepresented this quote by

23   making it appear to the jury that the French court had concluded that torture occurred

24   at Adra when it added a key word to its purported quotation – "***even***": "It's not ***even***

25   under discussion nor is it necessary to include in the examination of the appeal that

26

27   [2] This line regarding judicial notice does not appear in the draft transcript. All three

28   defense attorneys took notes of the government's use of this argument. It is
     maintained in this filing to preserve the record and all relevant issues.

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS
EXAMINATION AND TESTIMONY

1    during the periods at issue here between 1999 and 2006, and then between 2010 and

2    2012, the Syrian regime practiced torture against political opponents in particular

3    those held in Adra Central Prison or at the Harasta police hospital." (Ex. A, 21:16-

4    22 (emphasis added).)

5          Second, the only facts specifically cited about Adra in the opinion state that

6    torture occurred *outside* the prison: "A... admitted that for injuries which he clearly

7    believed were not accidental but instead caused *by acts of torture carried out during*

8    *interrogations by the investigation services outside the prison*--for example, in the

9    case of a fractured arm or nose--he wrote "fracture" and not "facture caused by an

10   act of torture." (*Id.* (emphasis added).)

11         The Netherlands Decision (January 30, 2023): The Netherlands decision

12   concerned an asylum application by a Syrian police officer who worked from 1993

13   to 2010. The statement quoted by the government was a general contextual finding

14   about Syrian detention practices broadly, not a specific factual determination about

15   conditions at Adra during any particular time period or under any particular

16   administrator: "And in this 2023 asylum application case, again, by a police officer

17   in Syria who was an officer from 1993 through 2010, the court stated, 'Suspects of

18   common crimes in Syria were subjected to widespread and systematic torture, ill

19   treatment and severe abuse. This torture took place during arrests at police stations,

20   in pretrial detention and in prisons, in particular the Adra prison.'" (Ex. A at 22:16-

21   22.) The statement appeared to have relied on general human rights reports and was

22   made in the context of denying the asylum applicant's claim. (Ex. C, Netherlands

23   Asylum Application Appeal dated Oct. 4, 2022.)

24         Neither case involved Alsheikh, neither case made findings about the 2005 to

25   2008 period specifically, and neither case constituted a judicial "holding" that torture

26   occurred at Adra during Alsheikh's tenure.

27

28

1    The government was undeterred by this. It doubled down. "But my question
2    was prior to your testimony today were you familiar with this court case **that**
3    **concluded that torture took place** during arrests at police stations in pretrial
4    detention and **in prisons in particular the Adra prison**?" (Ex. A, 32: 20-23
5    (emphasis added).) The government's presentation purposefully created a false
6    impression that foreign courts had already adjudicated the central factual issue in
7    this case – **that torture took place in Adra.** This misrepresents the foreign judicial
8    opinions, it exceeds the permissible scope of proper expert cross-examination, it is
9    impermissible hearsay, and it violates Alsheikh's Constitutional right to
10   confrontation.

11   ### III.    LEGAL ARGUMENT

12   **A. The government exceeded the permissible scope of expert cross-**
13   **examination**

14       While cross-examination of experts is afforded considerable latitude, the
15   Rules impose critical limitations that the government exceeded here. Federal Rule
16   of Evidence 705 permits cross-examination to require an expert to disclose the facts
17   or data underlying their opinion. A cross-examiner may also probe the foundation of
18   expert testimony by questioning the reliability of materials relied upon, the
19   methodology employed, and the expert's qualifications and assumptions.

20       Critically, materials not reasonably relied upon by experts or not admitted in
21   evidence generally cannot be used substantively to impeach unless strictly limited
22   to testing the expert's basis for opinion, and even then, such materials cannot be used
23   for the truth of their contents. Federal courts consistently enforce this limitation to
24   prevent parties from using impeachment as a backdoor method to introduce
25   otherwise inadmissible hearsay evidence. *See* Fed. R. Evid. § 703; *Ochoa–*
26   *Valenzuela v. Ford Motor Co.*, 685 Fed.Appx. 551, 554 (9th Cir. 2017) (error to
27   permit an expert witness to be cross-examined about an opinion given by his

28

business partner in deposition in a different case, noting that absent reliance by the testifying expert, "the use of testimony from another expert who did not testify in this trial constitutes admission of inadmissible hearsay") (citing *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1012 (9th Cir. 2008)); *see also, Jensen v. EXC, Inc.*, 82 F.4th 835, 850, 852 (9th Cir. 2023) (reversible error to cross examine expert witness on the competing opinions of a police report *even though* the expert had reviewed it in forming his opinion and finding risk of unfair prejudice greatly outweighed probative value).

Here, the government's cross-examination of Hanadi transgressed these foundational principles in multiple respects. Asylum cases that are typically under seal or, at least, exceedingly difficult to locate, exceed the boundaries of what Hanadi reasonably would have relied upon. When questioned as to whether she was familiar with either case, Hanadi testified she was not. The government kept going by (mis)reading the contents of the judicial opinions into the record for the evident purpose of backdooring hearsay to establish as true that torture occurred at Adra Prison during Alsheikh's tenure.

Moreover, the government's stated rationale that this Court can take judicial notice of court records because they are reliable is legally incorrect.[3] This Court did not take judicial notice of the foreign asylum decisions, and even if it had, judicial notice would not authorize reading the factual findings of those decisions to the jury for the truth of the matters asserted. Fed. R. Evid. § 201, O'Connor's Federal Rules, "Motion for Judicial Notice," ch. 5-N, §1 et seq.; O'Connor's Federal Civil Forms, FORMS 5N:1 et seq. (courts have taken judicial notice of court records from other cases for limited purposes, "but we did not, and could not, rely on it for the truth of the matter asserted", emphasizing that "if it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other

---

[3] *See* n. 2, *supra*.

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS EXAMINATION AND TESTIMONY

1  action, the doctrine of collateral estoppel would be superfluous") (citing *Hurd v.*
2  *District of Columbia*, 864 F.3d 671, 686 (D.C .Cir. 2017)). Nor did the government
3  request that this court take notice of foreign law. Fed. R. Civ. P. 44.1.

4      **B.  The government's cross examination violated the rule against hearsay.**

5      "[W]hile prosecutors are not required to describe sinners as saints, they are
6  required to establish the state of sin by admissible evidence unaided by aspersions
7  that rest on inadmissible evidence, hunch, or spite." *Sine,* 493 F.3d at 1032 (quoting
8  *United States v. Schindler*, 614 F.2d 227, 228 (9th Cir. 1980)). "That observation
9  applies as readily to questioning that incorporates inadmissible evidence as it does
10  to the direct introduction of such evidence." *Id.*

11      The government's reading of judicial findings from foreign asylum cases
12  constituted inadmissible hearsay under Federal Rules of Evidence 801 and 802. The
13  Ninth Circuit has squarely held that judicial findings constitute hearsay when offered
14  to prove the truth of those findings. *See Sine*, 493 F.3d at 1036 ("A court judgment
15  is hearsay 'to the extent that it is offered to prove the truth of the matters asserted in
16  the judgment.'" (quoting *United States v. Boulware*, 384 F.3d 794, 806 (9th Cir.
17  2004)); *see also Herrick v. Garvey*, 298 F.3d 1184, 1191–92 (10th Cir. 2002); *United*
18  *States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994); *Nipper v. Snipes*, 7 F.3d 415,
19  417 (4th Cir. 1993)). "It is even more plain that the introduction of discrete judicial
20  factfindings and analysis underlying the judgment to prove the truth of those findings
21  and that analysis constitutes the use of hearsay." *Sine*, 493 F.3d at 1036; *see also*
22  *United States v. Nelson*, 725 F.3d 615, 622 (6th Cir. 2013), as clarified on denial of
23  reh'g (Jan. 16, 2014) (vacating judgment and remanding due the admission of
24  prejudicial hearsay evidence).

25      *Sine* is instructive. At trial, the government sought to rebut the defendant's
26  good faith defense by cross-examining multiple defense witnesses about the factual
27  findings of an order issued by an Ohio federal district court judge in related civil

28

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS EXAMINATION AND TESTIMONY

litigation. *Id.* at 1027–28. The government's cross-examination technique was strikingly similar to the approach used here: the prosecutor repeatedly asked witnesses whether they were aware of specific findings by the Ohio district judge. *Id.* at 1028–29. The Ninth Circuit held that this line of questioning – "such 'speaking questions'" – was improper. *Id.* at 1031.

The court observed, "although the order was never admitted into evidence, a line of questioning that repeatedly incorporates inadmissible evidence can be just as improper as the direct admission of such evidence." *Id.* (citing "*United States v. Hall,* 989 F.2d 711, 716–17 (4th Cir.1993) (noting that by 'proceed[ing] to read the [inadmissible hearsay] statement to the jury under the guise of cross-examining ... [t]he government's use of [the] unauthenticated statement violated Fed. R. Evid. Rule 802 ....'); *see also* Fed. R. Evid. 103(c) ('In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as ... asking questions in the hearing of the jury.');  21 Charles Alan Wright & Kenneth W. Graham, Jr, Federal Practice and Procedure: Evidence § 5042, at 954, 963 (2d ed.2005) (noting that Rule 103(c) seeks to ensure the jury 'goes into deliberations with their minds void of everything except evidence that has been properly validated by trial procedures' and that the rule should apply to leading questions to witnesses 'that counsel should have known contained inadmissible evidence'); *cf. Douglas v. Alabama,* 380 U.S. 415, 419 (1965) (holding that '[a]lthough the Solicitor's reading of [the witness's] alleged statement, and [the witness's] refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that[the witness] in fact made the statement,' and therefore was the basis for a Confrontation Clause violation)."

Here, the government (mis)read statements from foreign judicial opinions stating that torture occurred at Adra Prison. The government offered these statements

8

1    for the truth of the matter asserted—that torture did in fact occur at Adra—to

2    improperly impeach Hanadi's testimony. This is textbook hearsay, and the

3    government's cross-examination technique mirrors the improper approach

4    condemned in *Sine*.

5        No hearsay exception applies. The learned treatise exception under Rule

6    803(18) is inapplicable because judicial opinions are not "treatise[s], periodical[s],

7    or pamphlet[s]." Moreover, the exception requires that the publication be

8    "established as a reliable authority by the expert's admission or testimony, by

9    another expert's testimony, or by judicial notice." Fed. R. Evid. 803(18)(B). Hanadi

10   expressly testified she was unfamiliar with both cases and the government's expert,

11   Dr. Leenders, never discussed them, precluding any foundation for treating them as

12   authorities she would reasonably rely upon.

13       The public records exception under Rule 803(8)(A)(iii) also does not apply to

14   judicial findings. *See Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993) ("Rule

15   803(8)(C), on its face, does not apply to judicial findings of fact; it applies to factual

16   findings resulting from an investigation made pursuant to authority granted by law.

17   A judge in a civil trial is not an investigator, rather a judge.") (citations omitted);

18   *Sine*, 493 F.3d at 1037 ("And although the Rule's public records hearsay exception

19   allows factual findings resulting from investigations conducted by public offices and

20   agencies, that exception does not apply against criminal defendants.") (citations

21   omitted).

22       Finally, two hearsay exceptions in the Federal Rules of Evidence explicitly

23   allow for the admission of judgments, but neither applies here. Rule 803(22) permits

24   "prior judgments involving criminal convictions subject to more than one year of

25   imprisonment," and Rule 803(23) permits "judgments used to provide proof of

26   matters of personal, family or general history, or boundaries." *See Sine*, 493 F.3d at

27   1036–37.

28

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS
EXAMINATION AND TESTIMONY

1

2

## C. The cross examination created substantial unfair prejudice under Rule 403.

3

4

5

6

Even if the judicial opinions were somehow admissible, their introduction was substantially more prejudicial than probative under Federal Rule of Evidence 403. The Ninth Circuit has repeatedly warned that judicial findings carry exceptional prejudicial weight with juries.

7

8

9

10

The *Sine* court observed that "factual testimony from a judge unduly can affect a jury" because "jurors are likely to defer to findings and determinations relevant to credibility made by an authoritative, professional factfinder rather than determine those issues for themselves." 493 F.3d at 1033–34. Th

11

12

13

14

15

16

17

18

19

20

21

22

23

The Ninth Circuit reiterated this concern in *United States v. Wiggan*, 700 F.3d 1204 (9th Cir. 2012), stating while "a judge's testimony or the use of a judge's findings and conclusions will not always result in unfair prejudice to the defendant, [] when their use is proposed, courts should proceed cautiously." *Id.* at 1210. The court cited the *Sine* court's approval of the Fourth Circuit's observation that "'judicial findings of fact' present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.'" *Id.* (quoting *Sine*, 493 F.3d at 1034). *See also Nipper*, 7 F.3d at 418 (holding that the admission of another court's findings read to the jury by plaintiff's counsel ***over the defendant's objection erroneous and reversed the jury's verdict based on the prejudice produced by the evidence***); *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 325 (E.D.N.Y. 2001).

24

25

26

Here, the prejudice is even more acute because the judicial findings directly address the central issue the jury must decide: whether torture occurred at Adra Prison under Alsheikh's direction as the director. *See Jensen v. EXC, Inc.*, 82 F.4th

27

28

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS EXAMINATION AND TESTIMONY

1  at 852 (reversing due to prejudicial error in allowing cross examination of an expert

2  on the competing opinions which went to the central issue to be decided).

3      The government presented foreign judicial opinions as having already

4  resolved this factual question, effectively asking the jury to defer to those

5  determinations rather than independently evaluate the evidence. As if it couldn't get

6  more acute, the government conveniently added a word in its recitation of one of its

7  quotations, which had the effect of changing the meaning and making it appear that

8  it was beyond question that torture occurred at Adra, rather than, as the court stated,

9  just not within the necessary scope for its findings. (*See infra*; Ex. A at 21: 16-22.)

10  This is precisely the harm Rule 403 is designed to prevent.

11      The government's cross-examination was also misleading in multiple

12  respects. First, through its questioning, the government portrayed – and called –

13  these foreign judicial opinions as "holdings" or "conclusions," (i.e., "court

14  concluded…") when they were not. (*See infra.*) Second, the government's questions

15  created the misleading impression that the foreign judicial opinions were relevant to

16  the specific charges against Alsheikh – that torture had, in fact, occurred at Adra

17  during the relevant time period under Alsheikh's direction. In fact, the government

18  out in the open said so: "were you familiar with this court case ***that concluded*** that

19  torture took place during arrests at police stations in pretrial detention and in prisons

20  in particular the Adra prison?" (Ex. A, 23: 20-23 (emphasis added).) The truth is,

21  though, that neither case involved Alsheikh, neither case made specific findings

22  about the 2005 to 2008 period at Adra Prison, and neither case addressed the conduct

23  of the director of Adra Prison during any period. The jury was left with the false

24  impression that authoritative judicial bodies had already adjudicated facts directly

25  bearing on Alsheikh's guilt and the ultimate issue in this case – whether torture

26  occurred at Adra under Alsheikh's direction.

27

28

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS EXAMINATION AND TESTIMONY

The introduction of foreign judicial opinions also created a substantial danger of confusing the issues before the jury. The jury's task is to determine whether the government has proven beyond a reasonable doubt that Alsheikh committed the charged offenses based on the evidence admitted at this trial. By introducing findings from foreign asylum proceedings – which applied different legal standards, addressed different parties, and resolved different questions – the government injected extraneous matters that distracted from the issues properly before the jury.

Moreover, the foreign asylum decisions were rendered under entirely different procedural frameworks. Asylum adjudications in France and the Netherlands involve different burdens of proof, different evidentiary standards, and different substantive legal questions than a criminal prosecution under 18 U.S.C. § 2340A in the United States. The jury cannot be expected to parse these distinctions when confronted with a prosecutor reading statements attributed to foreign courts. The inevitable result is confusion about what the jury is being asked to decide and what evidence properly bears on that determination. *See Sine*, 493 F.3d at 1040. This confusion of the jury's role—substituting deference to foreign judicial authority for independent factfinding—is precisely the harm Rule 403 is designed to prevent.

The government's resort to foreign judicial opinions is particularly unjustifiable because alternative, less prejudicial means of presenting the same evidence were readily available. The Rule 403 balancing analysis must account for the existence of evidentiary alternatives. *See Sine*, 493 F.3d at 1035 ("the use of [judicial findings] was violative of Rule 403 as tending to prejudice the jury given the consideration that the government could have proved the facts ... through less prejudicial means"); *see also Old Chief v. United States*, 519 U.S. 172, 184 (1997) ("what counts as the Rule 403 'probative value' of an item of evidence ... may be calculated by comparing evidentiary alternatives"). Here, the government had an obvious alternative—its own expert witness, Dr. Leenders, who testified extensively

on Syrian detention practices and his opinions regarding the occurrence of torture at Adra. Yet, the government still chose to introduce foreign judicial findings through the improper cross-examination of Hanadi, a tactic the *Sine* court expressly condemned as a "prejudicial shortcut" that cannot be justified by "practical difficulties" or claims that the evidence concerned "a tangential issue of no moment." *Sine*, 493 F.3d at 1035–36.[4]

## D. The government's cross-examination violated the Confrontation Clause.

The government's introduction of foreign judicial findings also violated Alsheikh's Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 71 (2004).

*Crawford* defined testimonial statements as including "prior testimony that the defendant was unable to cross-examine" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51–52. Foreign court opinions represent the quintessential formal judicial pronouncement: they result from structured legal proceedings, involve testimony and evidence presentation, and

---

[4] The government's conduct could also be considered prosecutorial misconduct. The Ninth Circuit has established clear boundaries against prosecutorial tactics that introduce inadmissible evidence through cross-examination. *See United States v. Sanchez*, 176 F.3d 1214, 1222 (9th Cir. 1999) (reversing conviction based on cumulative prosecutorial misconduct, including improper use of hearsay statements to impeach witness "under the guise of artful cross-examination, to tell the jury the substance of inadmissible evidence"). The case for misconduct is even stronger here given the government's insertion of key words that did not exist into quotes and further questions that stated another court had already concluded torture took place… in prisons in particular in Adra." (Ex. A, 23: 20-23.)

13

1  create binding legal determinations. *See e.g., United States v. Causevic*, 636 F.3d
2  998, 1002 (8th Cir. 2011) (holding testimonial a prior foreign court ruling introduced
3  to show that the defendant in fact committed the crime of which he was convicted).
4  This formal judicial process distinguishes them from the business records and
5  administrative documents that courts have found non-testimonial under statutes like
6  18 U.S.C. § 3505. *See United States v. Hagege*, 437 F.3d 943 (2006).

7       Because, here, both foreign courts were appellate courts reviewing the
8  asylees' petitions for reconsideration of the denial of their applications and appear
9  to have taken testimony or statements from the asylees and collected evidence from
10  them, the factual findings in the French and Netherlands asylum decisions fall
11  squarely within the confines of "testimonial." The government's evident purpose
12  was to establish that torture occurred at Adra Prison, the central factual dispute in
13  this case, by invoking the authority of foreign judicial determinations. This triggers
14  the full protections of the Confrontation Clause.

## IV.    A MISTRIAL IS WARRANTED, OR ALTERNATIVELY, THE TESTIMONY SHOULD BE STRICKEN AND A CURATIVE INTRUCTION GIVEN

18       The appropriate remedy for this improper line of questioning is a mistrial. The
19  prejudice from the government's improper cross-examination cannot be cured from
20  the Court's mid-testimony admonishment to the jury that questions are not evidence.
21  *United States v. Merino-Balderrama*, 146 F.3d 758, 764 (9th Cir. 1998) (holding
22  that the district court's inadequate instruction did not cure the prejudicial effect while
23  noting that "[a] timely instruction from the judge usually cures the prejudicial impact
24  of evidence unless it is highly prejudicial or the instruction is clearly inadequate");
25  *Nelson*, 725 F.3d at 622 ("a limiting instruction is not always sufficient to cure the
26  harm of highly prejudicial information improperly admitted at trial," particularly
27  when "***the prejudicial nature of the evidence and the fact that it went to the key***

28

1    ***issue for the jury's resolution*** made it unlikely that the limiting instruction

2    adequately protected" the defendant from prejudice (emphasis added)) (citing

3    *United States v. Martin,* 897 F.2d 1368, 1372 (6th Cir.1990);   *Bruton v. United*

4    *States,* 391 U.S. 123, 132 (1968)); *see also, Krekelberg v. City of Minneapolis*, 991

5    F.3d 949, 957 (8th Cir. 2021) ("a limiting instruction is not a cure for any and all

6    Rule 403 errors," noting that Rule 403's Advisory Committee Notes specifically

7    state that "consideration should be given to the probable effectiveness or lack of

8    effectiveness of a limiting instruction" when deciding whether to exclude evidence

9    on unfair prejudice grounds).

10       When judicial findings are represented to the jury as addressing nearly, if not

11   the, same ultimate issues as the current case, "the jury['s]…evaluations may be

12   prejudiced when the jury is in effect asked to rely on a third party's expertise

13   instead." *Sine*, 493 F.3d at 1035. Here, the government (mis)read to the jury

14   statements from foreign judicial opinions asserting that torture occurred at Adra

15   Prison, the precise fact the government must prove beyond a reasonable doubt. The

16   Court's mid-trial instruction cannot un-ring this bell. The jury has now heard that

17   foreign courts have purportedly found that torture occurred at the very facility where

18   Alsheikh served as director. This creates an insurmountable presumption of guilt that

19   cannot be eliminated through the Court's cautionary instructions.

20       In the alternative, if the Court determines that a mistrial is not warranted,

21   Alsheikh respectfully requests that the Court strike the government's line of

22   questioning and Hanadi's answers referencing the foreign judicial opinions and

23   instruct the jury to disregard them entirely. The Court should specifically instruct

24   the jury that: (1) the foreign judicial opinions are not evidence in this case; (2) no

25   court has made any finding that torture occurred at Adra Prison during the period

26   Alsheikh served as director; (3) the jury must base its verdict solely on the evidence

27   admitted at trial and must not give any weight to the government's references to

28

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS
EXAMINATION AND TESTIMONY

foreign judicial opinions; and (4) the jury must independently determine the facts without deference to any purported judicial findings from other proceedings. *See Merino-Balderrama*, 146 F.3d at 764 (reversing and remanding due to prejudice and inadequate limiting instruction).

## V.    CONCLUSION

For the foregoing reasons, Alsheikh respectfully requests that this Court grant his motion for a mistrial or, in the alternative, strike the government's improper cross-examination and provide curative instructions to the jury.

DATED: March 15, 2026                    Respectfully submitted,

By: */s/Jennifer Lieser*
NINA MARINO
JENNIFER LIESER
MORIAH RADIN
COLLIN CATE
Attorneys for Defendant
Samir Ousman Alsheikh

MOTION FOR ORDER OF MISTRIAL; OR, IN THE ALTERNATIVE, TO STRIKE IMPROPER CROSS EXAMINATION AND TESTIMONY